IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| ACCOHANNOCK INDIAN TRIBE, *et al.,* | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Case No. SAG-21-02550 |
| | * | |
| CLARENCE TYLER, *et al.,* | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

The Accohannock Indian Tribe, the Accohannock Indian Tribe, Inc., and Michael J. Hinman (collectively "Plaintiffs") filed this action against Clarence Tyler, Jerry Wimbrow, Billy Tapman, Jean Laughman, Vivian Tyler, Sandi Ennis, Julie Gilroy, Kenny Gilroy, and Diane Baldwin, real parties in interest (hereinafter referred to as "Interested Defendants"), and the Honorable Sidney S. Campen, Jr., Judge, Circuit Court for Somerset County, Maryland.  Plaintiffs sought declaratory, injunctive, and monetary relief for alleged constitutional and statutory violations, ECF 1, and a temporary restraining order ("TRO") followed by a preliminary and permanent injunction, ECF 11.  This Court conducted a two-day evidentiary hearing to resolve disputed issues regarding the federal status of the Accohannock Indian Tribe (hereinafter referred to as "Accohannock" or "the Tribe"), ECF 21, ECF 24, ECF 37, ECF 42, and its related implications for the authority of this Court to preside over the case.  This Court carefully reviewed the evidence presented, including various exhibits, ECF 31, ECF 33, ECF 36.  For the reasons stated herein, this Court shall abstain from exercising jurisdiction over this case.  Furthermore, even if abstention were not warranted, Counts I-II of Plaintiffs' Complaint would remain subject

1

to dismissal because they ask this Court to review the actions of a state court, contrary to the *Rooker-Feldman* doctrine. Accordingly, Plaintiffs' Complaint, ECF 1, shall be dismissed as to Counts I-II, and stayed as to Counts III-IV pending conclusion of the parallel proceedings in state court.[1]

## I.   BACKGROUND

### A. Historical Accohannock

The facts detailed herein are derived from the parties' briefings and exhibits, and the evidence presented at this Court's hearing.

"The Accohannock [] is one of the oldest historic tribes in Maryland." ECF 1 at 3. Prior to European contact, the Accohannock resided on "the Eastern Shore of the Chesapeake Bay of Olde Virginia and present-day Maryland." ECF 36-27 at 14. In pre-contact times, the Tribe was governed by a ceremonial tribal chief, a tribal council, and a series of clan mothers—or matriarchs—who presided over the extended family units within the Tribe. ECF 37 (Hinman Test., Evid. Hr'g). In pre-contact times, the Tribe appears to have been part of the Powhatan paramount chiefdom, and therefore subordinate to the Powhatan paramount chief, or emperor. *Id.*; *see also* ECF 31-3 at 29 (Helen C. Rountree and Thomas E. Davidson, *Eastern Shore Indians of Virginia and Maryland* (1997)).

The Tribe's first recorded interaction with Europeans occurred in 1608, when John Smith encountered both the Accohannock and the Accomac—another tribe within the Powhatan paramount chiefdom—during his exploratory expedition of the Chesapeake Bay. ECF 36-27 at 8.

---

[1] As a result of the rulings made herein, for administrative purposes, Plaintiffs' Motion for Temporary Restraining Order, ECF 11, and Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF 28, will be denied, subject to refiling when the stay is lifted. Also, the case will be administratively closed, subject to reopening when Plaintiffs file to lift the stay.

At that time, Smith estimated there to be 40 Accohannock and 80 Accomac, although the Tribe contends that these figures are low.[2]  *Id.* at 15.

In or around 1620, the English settlement in Virginia "that will eventually displace the natives" began to develop.  *Id.* at 10; *see also* ECF 31-3 at 51.  In the late 1630s, the Tribe "began to have intensive contacts—and therefore, problems—with English settlers."  ECF 36-27 at 19.  In 1640, the Tribe's southern confederates, the Accomac, were assigned to a 690-acre enclave, which English settlers referred to as the "Gingaskin Reservation."  *Id.* at 18; *see also* ECF 31-3 at 54, 208.  Plaintiffs assert that the Accomac displacement in 1640 established the Tribe as a separate nation, rather than merely a component faction of a confederacy.  ECF 37 (Hinman Test., Evid. Hr'g); *see also* ECF 31-3 at 55 ("The paramount chiefdom of 'the Eastern Shore' shifted northward to Occohannock territory after 1640, and no records clearly link the Gingaskins to it.").  Several paramount chiefs led the Tribe throughout the subsequent three decades, ECF 31-3 at 56-57, a period which was characterized by the steady loss of Accohannock land, *id.* at 65, 207.  Faced with shrinking lands and pressure to convert to English ways, many members of the Tribe decamped north from the Eastern Shore of Virginia into Maryland.  *Id.* at 66 ("[i]n the late seventeenth century, the Occohannock tribes intensified their contacts with the still-strong Indian groups in Maryland.  Some people probably moved there permanently, reducing the size of the populations who stayed."); *see also* ECF 36-27 at 22 (In the late seventeenth century, "[t]he Occohannock group seem eventually to have merged with groups to the north . . . ").  By 1666, the year in which Somerset County, Maryland, was formally established, the Tribe had parted with most of its land.

---

[2] The Tribe's petition for Maryland recognition, ECF 36-27, uses multiple spellings of the relevant tribes, including Occohannock, Accohannock, Accomac, and Accomack.  *See, e.g.*, *id.* at 14-15.  This Court assumes that "Occohannock" and "Accohannock" both refer to the Tribe, while the terms "Accomac" and "Accomack" refer to the Tribe's southern confederates.

ECF 36-27 at 19.  There are no further references to Accohannock land in Virginia's records after 1672.  ECF 31-3 at 66.  The Tribe asserts that it was "last mentioned in Maryland records," in 1676, albeit by the name "Annemessex."[3]  ECF 36-27 at 21.  After 1705, "[t]he Occohannocks vanished as recognizable tribal entities in Virginia."  ECF 31-3 at 82.

According to the Tribe's oral tradition, its disappearance from public view was part of a calculated survival strategy.  The Tribe maintains that in the late 1600s, its clan mothers correctly assessed European settlement as an existential threat, and prescribed that the Tribe assimilate into the general population to ensure its survival.  Pursuant to this survival plan, tribal families were instructed to "marr[y] their daughters into English settler families.  This enabled them, as they explain, [to] hide your 'red blood' among the 'white blood' until 'in the fullness of time, the tribe will be re-born.'"  ECF 36-27 at 26.  The Tribe asserts that this plan benefitted them because "assimilation within white society [] allowed them to stay in the land of their ancestors; living off the land and waters."  *Id.* at 30.  Moreover, this "'hide-in-plain-sight' tactic" enabled the Tribe to continue to "maintain[] close family and cultural traditions."  *Id.* at 26.  Plaintiffs estimate that this survival tactic was implemented in or around 1704 or 1705.  ECF 37 (Hinman Test., Evid. Hr'g).

Plaintiffs assert that although the survival plan resulted in the Tribe intermarrying and living amongst the general population, the Tribe retained its rich cultural heritage.  "Clan names survive even today and many of the Accohannock families have interacted with the same clans (adopting each other's children, witnessing land patents, etc.), and have remained on the same parcels of land for nearly three hundred years."  ECF 36-27 at 26.  Moreover, clans within the Tribe maintained "'homecomings' . . . during which [t]ribal members kept current on affairs

---

[3] The Annemessex tribe lived on the Little Annemessex River, *see* ECF 31-3 at 69, 96.  Plaintiffs assert that the Accohannock "were referred-to by the English, (who did not recognize one Indian from another), all under the same name—Annemessex."  ECF 36-27 at 19.

affecting us in the community . . . [c]lan [m]others reigned during these homecomings and were responsible for passing on orally the traditions and culture of the Tribe." *Id.* Plaintiffs contend that in this manner, the Tribe was able to remain intact despite its members presenting themselves—and being perceived as—part of Maryland's general population.

The Tribe stayed hidden throughout the 18th and 19th centuries, for fear of American oppression and discrimination. *See id.* at 27-28. Similarly, the Tribe remained out of public view for the first nine decades of the 20th century, despite a wave of "new pro-Indian public polic[ies]" during this period. *See id.* at 30-32 (citing the 1924 Indian Citizenship Act, the Johnson O'Malley Act of 1934, the Indian Civil Rights Act of 1968, the Indian Self-Determination and Education Assistance Act of 1975 and the American Indian Religious Freedom Act of 1978).

Indeed, the Tribe's retreat from public life persisted for nearly three hundred years, from approximately 1705 until in or around 1993.

## B. Tribal Rebirth

The Tribe reemerged into public view in 1993, when the Tribe, as "protected wards of a fellow Native group, the Pocomoke[], co-hosted the first annual American Indian Heritage Festival and Powwow" in Crisfield, Maryland. *Id.* at 32. Subsequently, the Tribe "amicably, (with the full support and blessing of the Pocomoke people), broke its ties with the Pocomoke, [and] formally reclaimed their original tribal identity." *Id*.

The Accohannock Indian Tribe, Inc., ("the Tribal Corporation") was incorporated as a Maryland nonstock corporation on December 7, 1994. The Tribal Corporation's bylaws, executed in January 1995, stated its corporate purpose as:

> [T]o promote the general welfare, health, education, and cultural heritage of Native Americans. To raise funds, under a tax exempt status, to enable us to teach and promote the American Indian history, culture, customs and traditions of indigenous Accohannock (Annemessex, Accomack Confederacy of the Powhatan Empire)

> Indian Tribal Descendants now living on the Delmarva Peninsula; to obtain
> recognition as a sovereign nation by the Federal and State governments; and to
> work with Public and Private Educational Systems of Delmarva to incorporate local
> Native American History as part of the school curricula . . .

ECF 11-3 at 1.  Hinman was one of several officers that executed the bylaws in his capacity as "Secretary and Keeper of Words."  *Id*. at 9.

In 2000, the Tribal Corporation adopted its Constitution (hereinafter referred to as "the Great Law").  ECF 11-1 at 5; *see also* ECF 31-1 (Ex. 1, the Great Law).  The Great Law created a tribal council to govern the Tribal Corporation, composed of a chairman (a/k/a "chair of the Tribe"), vice-chairman, secretary, treasurer, and three general council members.  ECF 31-1 at 4.  The tribal council is empowered to establish "a Department of Justice and Tribal Court; . . . a Housing Authority; . . . a Department of Health and Human Services; . . . [and] a Department of Education."  *Id.* at 6.  The Great Law also created a membership criteria for tribal members, which was limited to persons who are: (1) enrolled as members as of July, 2000; (2) direct descendants of such enrolled members, or; (3) persons who can provide "sufficient proof of lineal descendency."  *Id.* at 3.  The Great Law stipulated that upon submission, each application for membership shall be reviewed by the council of clan mothers, who will present a recommendation as to the application to the tribal council.  *Id.* at 2.  Once enrolled, an Accohannock enjoys lifetime membership unless the individual: (1) resigns; or (2) "is banished from the Tribe by the Tribal Court in a judicial proceeding as punishment for a violation of the laws of the Tribe."  *Id.* at 3.  Membership may not be granted to persons who are members of "any other organized band, tribe or Indian community," nor may the Tribe recognize honorary members.  *Id*.  The Great Law described its jurisdiction as extending to "its members in the aboriginal territory of the Tribe which is as follows: the original aboriginal territories."  *Id*. at 2.  The Great Law was executed by the

Tribe's then-enrolled members, including Hinman, Clarence Tyler ("Tyler"), and Wimbrow.  *Id.* at 19.

In December, 2015, the Tribal Corporation petitioned the Maryland Commission on Indian Affairs for recognition of Maryland Indian Status.  ECF 11-1 at 4; *see also* ECF 36-27 at 3.  In December, 2017, Governor Lawrence Hogan, on behalf of the State of Maryland, formally recognized the Tribe's "Maryland Indian status," and accorded the Tribe "all the rights and privileges to which formal State recognition . . . entitles them."  ECF 36-32 at 2.

The Tribe does not have, nor has it ever had, a reservation.  *Id.*  Although the parties' membership records differ, the Tribe—by all accounts—has fewer than 100-members, at least the slight majority of whom reside in the State.[4]  The Tribe has not been federally recognized by the United States Congress or the Federal Bureau of Indian Affairs ("BIA").  Despite its specified corporate purpose in its bylaws, *see* ECF 11-3 at 1, the Tribe has not formally applied for federal recognition.

**C.  State Case**

In May, 2020, Baldwin, Tyler, and Wimbrow (hereinafter referred to as "State Court Plaintiffs") filed suit against Hinman in Somerset County, Maryland Circuit Court individually and on behalf of the Tribal Corporation.[5]  As relevant here, State Court Plaintiffs alleged that Hinman had served as chair of the Tribe since 2015, during which time he committed numerous

---

[4] According to its petition for recognition of Maryland Indian Status, the Tribe consists of roughly 81 members, a majority of whom reside within a 40-mile radius of Marion, Somerset County, Maryland, and all but two of whom live in the State.  ECF 36-27 at 1.  Plaintiffs' membership list also reflects 81 members, 73 of whom reside in Maryland.  ECF 36-20.  For their part, Interested Defendants offered a list of 52 members, just 27 of whom reside in Maryland.  ECF 31-7.

[5] This Court may properly take notice of proceedings in other courts.  *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989).

*ultra vires* acts in violation of his fiduciary duties, including by unilaterally disposing of tribal assets.  Complaint ¶¶ 7, 17-18, *Accohannock Indian Tribe, Inc., et al. vs. Hinman*, 19-cv-20000075 (Somerset Cty. Md. Cir. Ct., May 18, 2020) (hereinafter referred to as "State Trial Court").  State Court Plaintiffs further alleged that in June, 2019, Hinman was unseated in a tribal election in which he did not participate.  *Id.* ¶¶ 23, 26.  Per the complaint, Hinman subsequently refused to recognize the results of the tribal election, or to acknowledge the legitimacy of the new tribal leadership in which State Court Plaintiffs served.  *Id.* ¶¶ 27-28.  State Court Plaintiffs sought declaratory judgment as to the parties' respective rights and obligations under the Tribal Corporation, its Great Law, and Maryland's corporate laws.  *Id.* ¶ 31.  State Court Plaintiffs further requested an accounting from Hinman involving matters related to the Tribal Corporation, and expressed an intent to pursue monetary damages as may be appropriate.  *Id.* ¶¶ 34-37.

In his answer, Hinman contested the legitimacy of the June, 2019, election and claimed that State Court Plaintiffs had "committed trespass and other tortious and unlawful actions against the Tribe in contravention of both Maryland law and the laws of the [] Tribe."  Answer ¶ 28, State Trial Court.  Hinman asserted that the State Trial Court lacked subject matter jurisdiction over the tribal dispute due to the non-intervention doctrine.  *Id.* ¶ 1.  Hinman further alleged several affirmative defenses including fraud and illegality on State Court Plaintiffs' parts.  *Id.* ¶¶ 11. Hinman subsequently filed a motion for protective order against discovery and further intervention by the State Court into the Tribe's sovereign affairs.  *See* Motion for Protective Order, State Trial Court.  In his motion, Hinman alleged that State Court Plaintiffs were allied with, or were members of, the Wolf Clan—an insurgent group of persons claiming indigenous, but not Accohannock,

descent—that had attempted to infiltrate the Tribe.[6]  *Id.* at 7-8.  Hinman alleged that although the Tribe had initially granted the Wolf Clan status as appointed members, such status had been rescinded in 2017; similarly, Tyler's lifetime membership had been revoked by the tribal council for his improper fraternization with the Wolf Clan.  *Id.* at 8-9.  As such, Hinman asserted that the June, 2019 election was an illegitimate power grab orchestrated by the Wolf Clan to usurp the valid tribal leadership.  *Id.* at 11.  Hinman also claimed that State Court Plaintiffs, specifically Tyler, had unlawfully intruded on the Tribe's property, *id.* at 10.  Finally, Hinman asserted that the Tribe is self-governing, and that "its Great Law is drafted to affirm the sovereignty of the Tribe."  *Id.* at 7.  While recognizing that "[t]he Accohannock [] is not a federally recognized tribe and, therefore, cannot assert immunity . . . interference in the affairs of a Maryland-recognized tribe should be approached with caution."  *Id.* at 12.  The State Trial Court—through presiding Judge Campen—denied Hinman's motion in November, 2020, and the case proceeded to discovery.  Order, State Trial Court (filed Nov. 5, 2020).

On April 9, 2021, the State Trial Court granted partial summary judgment in favor of the State Court Plaintiffs, affirming the Wolf Clan's status as members of the Tribe.  ECF 31-4 at 2.  The State Trial Court denied summary judgment on all other issues, including the legitimacy of the June, 2019 election, and the allegations of wrongdoing against all parties.  *Id.*  On June 21, 2021, after a two-day trial, the State Trial Court entered a memorandum opinion and order in favor

---

[6] Specifically, Hinman alleged that Baldwin and Wimbrow were Wolf Clan members lacking Accohannock descent, and that Tyler—although an Accohannock blood member—had allied with the Wolf Clan.  *See* Motion for Protective Order, State Trial Court, at 8.  Baldwin agreed in her testimony that she is a Wolf Clan member of non-Accohannock descent.  Both Mr. Tyler and Wimbrow represented in State Trial Court that they are Accohannock blood members, *see* Complaint, State Trial Court, at 3, although they were less definitive in their testimony in the federal court hearing, *see* ECF 42.

of the State Court Plaintiffs. *See* ECF 31-5. In its opinion, the State Trial Court rejected Hinman's assertion of the Tribe's sovereign immunity and analyzed the internal dispute under principles of Maryland corporate law.[7] *Id.* at 5-6. The State Trial Court order recognized an "Interim Administration" of the Tribal Corporation, required that a new tribal council election be held prior to December 31, 2021, and stipulated that the Interim Administration appoint a board of elections to oversee the process. *Id.* at 10. The order further stated that "to assure that the Board of Elections has access to the entire membership lists of the Tribe and the election takes place, the Court will retain jurisdiction over the matter until the election results are announced and the Council members take the Oath of Office." *Id.* Hinman filed a motion for a new trial, which was denied by the State Trial Court on July 13, 2021.

On July 22, 2021, Hinman appealed to the Maryland Court of Special Appeals, where the matter (hereinafter referred to as the "State Case") remains pending.[8]

### D. Procedural History

On October 5, 2021, Plaintiffs—namely, Hinman, on behalf of the Tribe and the Tribal Corporation—filed suit against Defendants in this Court. ECF 1. In the Complaint, Plaintiffs allege that the Wolf Clan, "a group of persons who have no common ancestry, but share an interest in Native American ways," ECF 1 ¶ 18, had surreptitiously asserted themselves as "true blood members" of the Tribe, *id.* ¶ 22. After allegedly "being expelled from the Tribe, the Wolf Clan

---

[7] Judge Campen concluded that the Tribe was not federally recognized, because it did not appear on the Federal Department of Interior's list of federally recognized tribes. ECF 31-5 at 5 (citing *LaSalle Bank, N.A. v. Reeves*, 173 Md. App. 392, 403-04 (2007). Judge Campen also found that to the extent the Tribe had sovereign immunity, it was waived because the Tribal Corporation was a named plaintiff in the suit. *Id.* at 6.

[8] For simplicity's sake, this Court uses the term "State Case" collectively to refer to both the proceedings in the State Trial Court and Hinman's pending appeal to the Maryland Court of Special Appeals.

conspired to seize control of the Tribe's assets by improper means." *Id.* ¶ 23. Interested Defendants allegedly implemented a "sham election," which they used to fraudulently represent themselves as officers of the Tribe in order to obtain tribal assets. *Id.* ¶¶ 25-27. As part of this scheme, "Defendants, Wimbrow, Tyler, and Baldwin [State Court Plaintiffs], purporting to act as the Tribal Council of the Tribe, filed suit in the Circuit Court of Somerset County, Maryland against Michael J. Hinman, Chairman of the Tribe." *Id.* ¶ 29. Plaintiffs allege that the State Trial Court's intervention in the dispute caused a continuing violation of the Tribe's sovereign immunity. *Id.* ¶ 36. Plaintiffs' Complaint states four claims. In Count I, Plaintiffs seek declaratory judgment "that the Tribe is immune from suit . . . that the Tribe and the Tribal Corporation have not waived sovereign immunity, and that the Order entered by Judge Campen is null and void." *Id.* ¶ 43. In Count II, Plaintiffs request an injunction prohibiting Interested Defendants from entering the Tribe's cultural center, interfering with the Tribe's assets, holding an election, or representing themselves as members of the Tribe, and prohibiting Judge Campen "from taking any action to enforce his Order[s] . . . ". *Id.* ¶ 45. In Counts III-IV, Plaintiffs seek monetary damages for Interested Defendants' alleged violations of the Racketeer-Influenced Corrupt Organizations ("RICO") Act (Count III), and alleged deprivation under color of state law of Hinman's equal rights in violation of § 1983 (Count IV).

Plaintiffs also filed a motion for TRO, asserting the Tribe's sovereign immunity and requesting relief from the State Trial Court's order. ECF 11. Plaintiffs specifically requested that the TRO require Interested Defendants to return the Tribe's assets; and enjoin Interested Defendants from entering the Tribe's cultural center, interfering with its assets, or holding an election in its name. *Id.*

Upon review of Plaintiffs' filings, this Court requested supplemental briefing from the parties as to the Tribe's status under federal law, and the applicability of various federal abstention doctrines in light of the ongoing judicial proceedings in State Court, ECF 14.  The issues were fully briefed, ECF 17, ECF 18, ECF 19, ECF 20.  After review, this Court concluded that resolution of whether the Accohannock is a "tribe" pursuant to federal law, such that it enjoys sovereign immunity, was necessarily precedent to this Court's determination as to its own subject matter jurisdiction and the appropriateness of its exercise of such jurisdiction.  ECF 21 at 1.  This Court accordingly ordered an evidentiary hearing to determine facts relevant to the Tribe's federal tribal status.  The evidentiary hearing was conducted over a two-day period, ECF 37, ECF 42.

## II.    FEDERAL COMMON LAW TRIBAL STATUS

### A.  Legal Standard

"Indian tribes are 'domestic dependent nations' that exercise 'inherent sovereign authority.'"  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991)).  "Common-law immunity from suit" is among the core aspects of sovereignty authority possessed by Indian tribes.  *Id.* (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978) ("Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers.")).

To enjoy immunity from suit, an Indian tribe must be recognized as such under federal law.  A group of Indians is a tribe for purposes of sovereign immunity if it has been recognized by (1) Congress; (2) the Executive Branch, through the Bureau of Indian Affairs, or; (3) by the courts as meeting the federal common law definition first articulated in *Montoya v. United States*, 180 U.S. 261 (1901).  *See Cherokee Nation of Oklahoma v. Babbitt*, 117 F.3d 1489, 499-500 (D.C. Cir.

12

1997); *see also Native Vill. of Tyonek v. Puckett*, 957 F.2d 631, 635 (9th Cir. 1992); *Gristede's Foods, Inc. v. Unkechuage Nation*, 660 F. Supp. 2d 442, 465 (E.D.N.Y. 2009).  Under *Montoya* and its progeny, an Indian tribe is: "[1] a body of Indians of the same or a similar race, [2] united in a community under one leadership or government and [3] inhabiting a particular though sometimes ill-defined territory."  180 U.S. at 266.  Tribes satisfying the *Montoya* criterion are entitled to sovereign immunity.  *See Gristede's Foods*, 660 F. Supp. 2d at 468; *Native Vill. of Venetie I.R.A. Council v. State of Ak.*, 1994 WL 730893, at *4 (D. Alaska Dec. 23, 1994).  Once established, tribal immunity applies not only to the tribe itself, but also to arms of the tribe, and to tribal officials sued in their official capacity.  *See White v. Univ. of California*, 765 F.3d 1010, 1025 (9th Cir. 2014) ("Tribal sovereign immunity not only protects tribes themselves, but also extends to arms of the tribe acting on behalf of the tribe."); *Lewis v. Clarke*, 137 S. Ct. 1285 (2017) (applying traditional principles of official immunity to individual sued in capacity as tribal official).

In their Complaint, Plaintiffs urge this Court to prevent further interference by the State Trial Court in the Tribe's sovereign affairs.  *See, e.g.*, ECF 1 ¶ 41.  Plaintiffs, as the parties seeking to invoke sovereign immunity, bear the burden of establishing tribal status by a preponderance of the evidence.  *See Gristede's Foods*, 660 F. Supp. 2d at 465; *City of New York v. Golden Feather Smoke Shop*, 2009 WL 705815, at *4 (E.D.N.Y. Mar. 19, 2009); *Great Plains Lending, LLC v. Dep't of Banking*, 339 Conn. 112, 123 (2021).

**B. Analysis**

Plaintiffs do not suggest that the Tribe has been recognized by the United States Congress or Executive.  Accordingly, Plaintiffs bear the burden of demonstrating by a preponderance of the evidence that the Tribe is: "[1] a body of Indians of the same or a similar race, [2] united in a community under one leadership or government and [3] inhabiting a particular though sometimes ill-defined territory." *Montoya*, 180 U.S. at 266.  Although this Court does not question the Tribe's members' heritage and identity, or the centrality of the Tribe to its members' lives, it concludes that Plaintiffs failed to meet their burden of satisfying the *Montoya* standard in order to invoke tribal sovereign immunity.

**i.   Same or Similar Race**

The first *Montoya* criterion is whether the Tribe is a "body of Indians of the same or similar race."  Modern courts analyzing this factor are not restricted to the conception of "race" held by Justice Brown at the time of the 1901 *Montoya* decision.  *See Gristede's Foods*, 660 F. Supp. 2d at 471.  Rather, courts use anthropological and historical data to assess whether an Indian group was (1) identified—both by themselves and others—as a separate and distinct group of Indians at various points between its first contact with Europeans and the present; and (2) whether the group at present descended from common ancestors.  *Id*. (citing *Native Vill. of Venetie*, 1994 WL 730893, at *13.

This Court is satisfied at Plaintiffs' showing that the Tribe is composed of members of the same or similar race.  Plaintiffs provided historical evidence—much of which was compiled by Hinman and included in the Tribe's petition for state recognition, ECF 36-27—showing the Accohannock were identified as a separate and distinct group of Indians at the time they first encountered Europeans in 1608.  *See* ECF 36-27 at 15 (explaining that John Smith estimated the

14

Accohannock population during his exploratory expedition of the Chesapeake Bay in 1608).
Moreover, documentary evidence indicates that Europeans continued to regard the Tribe as a
distinct entity for the next several decades. *See id.* at 21-22 (noting that the Tribe last appeared in
Maryland and Virginia records in 1676 and 1672, respectively).

Plaintiffs also provided evidence tending to show that the group at present descended from
common tribal ancestors. The Tribe provided genealogical histories evidencing that the "seven
principal families of the current Accohannock Tribe . . . are the descendants of known
Accohannock." ECF 36-6; *see also* ECF 36-7–36-13. Moreover, the Great Law stipulates that
tribal membership is contingent on lineal descendancy from existing or historic members of the
Tribe. ECF 31-1 at 3. Defendants, for their part, assert that the Tribe's current members only
evidence proof of indigenous or Native American ancestry, and not, as Plaintiffs' insist, common
Accohannock ethnicity. *See* ECF 37 (Evid. Hr'g); ECF 42 (Wimbrow Test., Evid. Hr'g); *see also*
ECF 19 at 2 ("Although many of the members of the present 'Tribe' claim descent from the
original Accohannock Indians, others, including Senior Clan Mother Diane Baldwin, are descents
of other Indian tribes."). This Court also acknowledges that there is evidence suggesting that the
Tribe publicly extended its membership to individuals of any Indian descent, irrespective of tribal
status. *See* ECF 36-27 at 244 (local news article reporting that "[a]lso, anyone with Indian heritage
is welcome to join the Accohannock tribe"); *id.* at 259 (written statement from then-chief Rudy
Hall stating that "[i]f you believe you may be one of the many American Indian people mentioned
above, we would like to extend to you an invitation to explore your heritage with the
Accohannocks through membership."). Even so, this Court is satisfied that the Tribe's
genealogical evidence tracing its core members to common Accohannock ancestors shows, by a

preponderance of evidence, that the current Tribe are members of the same or similar race.  *See* ECF 36-6 – ECF 36-13.

ii.     **Community under one leadership or government**

The second *Montoya* criterion asks whether the native entity is "united in a community under one leadership or government."  180 U.S. at 266.  This factor acknowledges that "without leaders (some governance), there can be no tribe.  Similarly, leadership without a community to lead is meaningless and ignores the realities of man's political nature."  *Venetie*, 1994 WL 730893, at *15.  To satisfy this factor, Plaintiffs "must demonstrate that [the Tribe] are joined together as a unit through beliefs, way of life, or the like *which go beyond just ethnicity and place of residence*."  *Id*. (emphasis added).  Courts analyzing this prong consider the "nature and extent of leadership or governance as it related to things of importance in the life of the [tribe]" and "how leadership passed and how government evolved."  *Id.* at * 14-15.  Here, Plaintiffs lack sufficient evidence showing that the Tribe is a community united under one leadership or government, as contemplated by *Montoya*, for several reasons.

First, Plaintiffs fail to establish by a preponderance of evidence that the Tribe or Tribal Corporation presently maintains any semblance of a functioning government.  Although the Tribal Corporation is organized in a hierarchal manner reminiscent of the historic Accohannock—with a tribal council, tribal chief, and a series of clan mothers—there is little evidence that the Tribe's leadership or governing documents are imbued with any meaningful authority.  Plaintiffs offered no examples in which the Tribe or tribal leadership provided public services for its members, such as an adjudicative or disciplinary forum, public safety resources, elementary education, housing assistance, or healthcare services.  Although Plaintiffs' witnesses insisted that the Tribe eschewed a formal court system in favor of informal interpersonal mediations and interventions, they could

not enumerate specific instances of successful dispute resolution or disciplinary action.[9] Relatedly, the evidence before this Court raises significant questions as to the extent to which the Tribal Corporation has ever observed the Great Law, its constitution.  At the hearing, Hinman conceded that the Tribe has not created any of the agencies that are authorized in its Great Law. ECF 37 (Hinman Test., Evid. Hr'g).  Similarly, the evidence suggests that many of the Tribe's membership and leadership practices are in direct contravention to, or at least unmoored from, the Great Law.  From at least from 2000 until 2013, membership applications were not reviewed by the council of clan mothers, ECF 42 (Baldwin Test., Evid. Hr'g).  The Tribe has recognized appointed, or honorary, non-Accohannock members, and has allowed such appointed members to serve as officers of the Tribe.  *See* ECF 36-20.  The role of ceremonial chief has not been passed to the outgoing chief's eldest male heir, *see* ECF 42 (Baldwin Test., Evid. Hr'g), and lifetime members have been expelled without adjudication from a tribal court, which does not exist, *see* Motion for Protective Order, State Trial Court.  Simply put, in light of the record of regular disregard of the Great Law's provisions, Plaintiffs did not provide sufficient facts that would allow this Court to infer that the Tribe or Tribal Corporation maintains a meaningful leadership or government.

Second, Plaintiffs do not carry their burden of demonstrating that the Tribe is a unified community.  Plaintiffs and Interested Defendants each proffered versions of tribal membership lists, which bear little resemblance to the other.  Plaintiffs' list detailed 81 members, almost all of whom reside in Maryland, ECF 36-20; Interested Defendants' membership records reflect only 52

---

[9] Plaintiffs also offered witnesses who testified that the tribal council was a functional governing entity because it held regular meetings at which it kept minutes.  *See* ECF 37 (Bowen Test., Evid. Hr'g).  This conduct alone, however, does not distinguish the Tribe or Tribal Corporation from other functioning entities, most of which are not considered governing authorities or governments.

persons, nearly half of whom reside outside the State, ECF 31-7.  The two lists share only four individuals in common, suggesting that they are essentially two separate communities.  *Id.* Moreover, Plaintiffs and Interested Defendants both excluded from their respective membership records several living persons that executed the Tribe's Great Law.[10]  These discrepancies may indicate a lack of knowledge of the identities of the other members of the Tribe.  *See* ECF 42 (Tyler Test., Evid. Hr'g) (asserting that Interested Defendants' list differed from Plaintiffs' because Hinman refused to provide official membership lists).  It may also suggest a disregard for, or rejection of, certain members.  *See* ECF 36-20 (Plaintiffs' membership list excluding Tyler, who, with Hinman, cosigned the Great Law and the Tribe's petition for state recognition).  In either instance, the discrepancies are certainly not indicative of a coherent or unified community.

Third, even assuming the existence of a cohesive community, Plaintiffs' evidence falls short of demonstrating that it is bound by distinctly Accohannock customs, beliefs, or ways of life, and not merely by a shared indigenous ethnic ancestry.  *See Venetie*, 1994 WL 730893, at *15. The Tribe's outward-facing or public events often promoted and emphasized indigenous cultures broadly, rather than Accohannock customs specifically.  *See, e.g.*, ECF 36-27 at 32 (co-hosting the American Indian Heritage Festival as protected wards of the Pocomoke); *id.* at 246 (the Accohannock Indian Powwow and Festival is "designed to bring all American Indians together to celebrate their shared heritage of music, dancing, and food."); *id.* at 259 ("If you believe you may be one of the many American Indian people mentioned above, we would like to extend to you an invitation to explore your heritage with the Accohannocks through membership"); *see also* ECF

---

[10] For instance, Plaintiffs' membership list does not include Wimbrow, Beulah Tyler, Tyler, Gerald Tyler, Tracy Hall, or Mary Hall, all of whom executed the Great Law and appear on Interested Defendants' list.  *See* ECF 36-20.  Likewise, Interested Defendants' list contains no mention of Juanita Kozlowski and Susan Powell, both of whom signed the Great Law and appear among the members on Plaintiffs' lists.

11-3 at 1 (stating that the Tribal Corporation "has organized to promote the general welfare, health, education, and cultural heritage of Native Americans."). Similarly, evidence regarding the Tribe's internal dynamics indicates a relatively generalized embrace of indigenous and Indian cultures, detached from any specific tribal affiliation. For instance, although Plaintiffs' witnesses testified that their relatives privately celebrated their Indian heritage, this testimony did not suggest any familial emphasis on, or recognition of, a distinct Accohannock culture, community, or traditions. Indeed, through anecdotes, Tribe members expressed identities strongly grounded in their self-perception as Indians, rather than Accohannock. *See, e.g.*, ECF 36-37 (Statement by Mary Hall that her grandmother "would put her good clothes on to go out into public, which she called the white mans' world, and come home and put on her old clothes and raggedy shoes, that is her way of being her Indian," and that her family "grew our own vegetables and had our own animal meat and worked in seafood. And we also lived that way as Indian."). Indeed, Plaintiffs' witnesses offered no testimony sufficient to infer that they were even aware of any familial affiliation with a specific tribe, prior to recent historical and genealogical research. *See* ECF 37 (Hinman Test., Tyler Test., Evid. Hr'g).

In addition to satisfying the original *Montoya* criterion, courts in the Ninth Circuit also require that "the native entity claiming tribal status [] be the 'modern-day successors to sovereign historical bands of natives.'" *Venetie*, 1994 WL 730893, at \*15 (quoting *Native Vill. of Venetie I.R.A. Council v. State of Alaska*, 944 F.2d 548, 559 (9th Cir. 1991)); *see also United States v. State of Wash.*, 641 F.2d 1368, 1372-73 (9th Cir. 1981) (requiring that "some defining characteristic of the original tribe persists in an evolving tribal community."). This inquiry acknowledges that "[a] degree of assimilation is inevitable . . . and does not entail abandonment of distinct Indian communities . . . [but] [w]hen assimilation is complete, those of the group

purporting to be the tribe cannot claim tribal rights." *State of Washington*, 641 F.2d at 1373. Federal courts in jurisdictions outside the Ninth Circuit have incorporated this inquiry into the "community and leadership" prong, asking whether the entity is a "'the modern day successor' to a historical sovereign entity that exercised at least the minimal functions of a governing body." *Gristede's Foods*, 660 F. Supp. 2d at 474 (quoting *Native Village of Tyonek*, 957 F.2d at 635 (9th Cir. 1992)); *see also Unalachtigo Band of Nanticoke-Lenni Lenape Nation v. New Jersey*, 2008 WL 2165191, at *15 (D.N.J. May 20, 2008) (vacated in part on other grounds).  While courts undertaking this analysis acknowledge that such continuity may have been impeded by discrimination or oppression, it is nonetheless "required by the communal nature of tribal rights. To warrant special treatment, tribes must survive as distinct communities."  *State of Washington*, 641 F.2d at 1373.

Plaintiffs here cannot demonstrate continuity between the Tribe and the historic Accohannock.  Put differently, Plaintiffs fail to carry their burden of showing that the Tribe is a modern-day successor to, rather than a recreation of, a historic sovereign entity.  This Court does not dispute that the historic Accohannock existed as a sovereign entity from at least 1640 until in or around 1705.  Nor does this Court contest that the incorporation of the Tribal Corporation in 1994, and the resurgence of the Tribe itself, signals a sincere, collective mission to reclaim its shared indigenous identity.   In the intervening 289-year period between its dissolution and resurgence, however, the Tribe lacked any cognizable governing structure or public presence. Plaintiffs do not dispute that during this period, the Tribe did not elect a chief, a paramount chief, or a tribal council.  *See* ECF 36-27 at 234 ("Accohannock Tribe names Rudy Hall its first chief in 300 years").  Moreover, during this time, the Accohannock were fully assimilated into the general populations of Virginia and Maryland; its members lived amongst, and intermarried with white

20

settlers, and largely disclaimed any outward signifiers of their Indian identity. *See State of Wash.*, 641 F.2d at 1373-74 (concluding individuals who had "intermarried with non-Indians" and "have not settled in distinctively Indian residential areas" cannot establish political and cultural cohesion.).

Plaintiffs, for their part, insist that the Tribe continued unabated throughout this nearly three-century period, albeit in secret. Plaintiffs argue that although the Tribe lacked a chief and council, it maintained an extended clan system, led by matriarchal clan mothers. To substantiate this claim, Plaintiffs proffered testimony that as children, Tribe members attended clan meetings— alternatively referred to as family reunions—in which clan mothers met and discussed tribal news. *See, e.g.*, ECF 37 (Tyler Test., Evid. Hr'g). This evidence falls short for several reasons. First, with regards to the family reunions, Plaintiffs provided little evidence as to who attended these meetings, or what was discussed, such that the gatherings could be construed as evidence of a continuing and functioning sovereign, rather than merely as social or familial gatherings.[11] Second, and more fundamentally, Plaintiffs' testimony is incongruent with the majority of its evidence, which depicts the Tribe as "newly formed" in light of several members' recent discovery of their Accohannock heritage. *See* ECF 36-27 at 43-44. Plaintiffs offered evidence that the

---

[11] Plaintiffs' witness was asked to provide examples of coherent political action taken by the Tribe in the period between 1705 and 1993. In response, Hinman recalled episodes in which elders dissuaded individuals from unwittingly initiating sexual relationships with their relatives, or where elders punished infidelity or resolved domestic disputes. ECF 37 (Hinman Test., Evid. Hr'g); *see also* ECF 36-27 at 290 ("An Accohannock official recalled how his father had an affair with a married woman and a daughter out of wedlock resulted. As years passed, his brother started dating the daughter and the father's wife, who was a Clan Mother, told the truth. She told the brother that he had to stop seeing her because she was a half sister"); *id.* at 289 ("[A] wife was beaten by her husband and complained to the Clan Mothers . . . the Clan Mothers . . . went to the home of the beaten woman, thrashed the husband and exiled him from the Tribe."). This evidence, however, does not amount to government action and does not suffice to distinguish the Tribes' clans from the informal social or familial networks that characterize many tight-knit communities.

Tribe's first modern chief and chair, Rudy Hall and Ann Buck Mackay, respectively, organized as a subsidiary group of the Pocomoke before genealogical research identified their Accohannock affiliation.  *See* ECF 36-37 (Former chief Rudy Hall stating that "at first, we went with the Pocomoke tribe . . . but the genealogist . . . we gave him our genealogy and when he looked it up, he said we were Accohannock we weren't Pocomoke."); *see also* 36-27 at 43-44 ("Ann [MacKay] became the Chairman of the newly formed Accohannock band under the Pocomoke Tribe.  They obtained a grant to do more extensive genealogy studies.  Following these studies, the Chief of the Pocomoke and the Chairman of the Accohannock determined that they should be two separate groups.").  MacKay subsequently shared this newfound history with several members of the Tribe's principal families, who until that point, were similarly unaware of their Accohannock heritage.  *See* ECF 36-27 at 43 ("Ann Buck MacKay contacted many of the descendants of the original Sterling Clan families to share the history . . .".); *see also* ECF 36-37 (Statement from Mary Hope Billings that "[i]In 1995 I was contacted by Ann Buck Mackay . . . she called me and said are you related to Owen Cullen [sp] . . . and I said yes . . . and with that, she sent me information, she told me of our people.").  These efforts culminated in the formation of a resurgent, public-facing Accohannock Tribe, led by its first chief in nearly three centuries.  *See* ECF 36-37 (Rudy Hall stating that "I was put up for election and they elected me the first chief in 400 years"); ECF 36-27 at 234 ("Accohannock Tribe names Rudy Hall its first chief in 300 years").  In his capacity as the Tribe's first modern chief, Hall acknowledged that "our ancestors abandoned the culture and the language for survival," and endeavored "to reclaim that abandoned culture."  ECF 36-27 at 250.

Simply put, Plaintiffs' own evidence suggests that the Tribe is a reincarnation of the historic Accohannock, motivated in part by several members' recent discovery of their ethnicity

and genealogy.   Although certainly commendable, this self-described effort to "reconnect as indigenous people" is inconsistent with the caselaw's requirement for continuity between an original sovereign tribe and a surviving tribal community. [12]  *See State of Washington*, 641 F.2d at 1372-73.

### iii.   Same or similar territory

The final *Montoya* criterion has been characterized as whether a group of Indians inhabit "'an ill-defined area of land' without regard to ownership."  *Gristede's Foods*, 660 F. Supp. 2d at 462.  For purposes of this criterion, "specific boundaries need not be drawn . . . [and] some out-migration of members is not proof that a purported tribe does not occupy a particular area."  *Venetie*, 1994 WL 730893 at *14; *see also Shinnecock Indian Nation*, 400 F. Supp. 2d at 493 (occupation under lease of 100-acre reservation in Long Island is sufficient); *Gristede's Foods*, 660 F. Supp. 2d at 476 (historic and continuing occupation of 50-acre territory satisfies criterion).

Plaintiffs' evidence indicates that the historic Accohannock resided "in the Eastern Shore of the Chesapeake Bay of Old Virginia and present-day Maryland," ECF 36-27 at 101, and at some

---

[12] Plaintiffs assert that because the Tribe undisputedly operated as a sovereign until at least 1705, this Court should presume that it continues as such today.  ECF 42 (Evid. Hr'g.).  Plaintiffs cite *Babbitt* as support for this "presumption of continuity."  *Id.* (quoting 117 F.3d at 1502).  That case, however, stands for nearly the opposite proposition.  In *Babbitt*, the D.C. Circuit concluded that a tribe could not assert sovereign immunity after its merger with the Cherokee Nation.  In its reasoning, the Court first observed that, "[t]he fact that a tribe's sovereign immunity continues even after it has dissolved or abandoned its tribal government, is, for our purposes, beside the point."  *Id.* (citing *United States v. United States Fidelity & Guar. Co.*, 309 U.S. 506, 512 (1940)).  This principle was irrelevant in light of facts suggesting that the tribe's incorporation into the Cherokee Nation constituted "a more radical disavowal of tribal identity than mere dissolution of governmental institutions."  *Id.*  Indeed, after its merger with another tribe "it would be anomalous to hold that the two tribes each retained a separate governmental existence after such a merger."  *Id.*  Here, too, the Tribe's disavowal of tribal identity after 1705 is far more radical than its mere lack of a tribal chief and council.  As detailed throughout, the Tribe not only disbanded its government but "abandoned the culture and language," ECF 36-27 at 250, and fully "assimilate[ed] within white society," *id.* at 30.  Just as the tribe in *Babbitt* could not retain separate sovereignty from the nation into which it had assimilated, neither here, can the Accohannock.

point, dispersed north and blended into tribes residing in present-day Somerset County, Maryland. *See id.* at 22, 222; ECF 31-3 at 65.  In its 2015 petition for state recognition, the Tribe represented that "[a]lthough we number only 81 people, the majority live within a forty mile radius to our present location in Marion, Maryland, just outside Crisfield, [Somerset County,] Maryland.  Only 2 of our people live outside of the State of Maryland."  ECF 36-27 at 1.  Since its petition, the ranks of the Tribe's out-of-state members has evidently grown.  Plaintiffs' membership list indicates that nearly 10% of its members live outside Maryland, ECF 36-20, while Defendants' list reflects that 48% of the Tribe resides outside the State, ECF 31-7.

Even crediting Plaintiffs' account, this Court cannot conclude that the Tribe fulfills *Montoya*'s requirement of residence in the same or similar territory.  The Tribe's petition for state recognition asserts that a majority of the Tribe's resides within a 40-mile—or 25,600 acre—radius of Crisfield, Somerset County, Maryland.  This radius encompasses multiple counties and several populous towns in the Eastern Shore of Maryland, and is relatively dispersed in comparison to tribes that have been found to satisfy this factor.  *Compare Shinnecock Indian Nation*, 400 F. Supp. 2d at 493 (occupation under lease of 100-acre reservation); *Gristede's Foods*, 660 F. Supp. 2d at 476 (historic and continuing occupation of 50-acre territory).  Plaintiffs offered no evidence to suggest that the members living within this radius reside in any contiguous or communal area, which could be reasonably defined as exclusively or even predominantly Accohannock.  *See Venetie*, 1994 WL 730893 at *14 (*Montoya* factor satisfied where tribe "since before the appearance of non-natives, inhabited a reasonably well-defined territory to the virtual exclusion of other people; and in modern times have occupied much of that same territory, in the form of the [tribal] Reservation.").

In sum, Plaintiffs fail to demonstrate that the Tribe has continuously survived as a unified, governed community in an identifiable area or territory, such that it can fairly be construed as meeting the federal common law definition of a tribe under *Montoya*. This Court does not dispute the authenticity of the Accohannock's cultural heritage, its reorganization under the Tribal Corporation, or the State of Maryland's recognition of the Tribe as such. Moreover, like other courts required to apply this analysis, this Court is sensitive to the nation's historic legacy of contempt for, and repudiation of, Indian identity and autonomy. While the *Montoya* standard from 1901 may not be the most politically appealing standard considering modern sensibilities, it is the only standard available under federal common law for this Court to employ. *See also Gristede's Foods*, 660 F. Supp. 2d at 470 ("Against the backdrop of these conflicting practices of the federal government with regard to Indians, the court finds application of the *Montoya* criteria problematic. Nevertheless, the court is bound by precedent to apply the *Montoya* criteria for tribal recognition pursuant to federal common law."). In light of binding precedent, then, this Court must conclude that Plaintiffs have not established by a preponderance of the evidence that all three *Montoya* criteria are satisfied. Thus, the Tribe is not entitled to sovereign immunity under federal law. That determination impacts the abstention analysis described below.

## III.    ABSTENTION

"Federal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821)). Indeed, it "is well recognized that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Ackerman v. ExxonMobil Corp.*, 734 F.3d 237, 248 (4th Cir. 2013) (quoting *McLaughlin v. United Va. Bank*, 955 F.2d 930,

934 (4th Cir. 1992) (internal quotation marks and alteration omitted)).  There are, however, "extraordinary and narrow exception[s]" under which a federal court may appropriately decline to exercise jurisdiction based on the pendency of a related state court proceeding.  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976) ("[A]bstention . . . is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-189 (1959))).

Plaintiffs' Complaint here includes claims for damages (Counts III-IV) as well as for declaratory and injunctive relief (Counts I-II).  Although abstention doctrines apply to suits in both law and equity, their application necessitates different remedies.  "[W]here the relief being sought is equitable in nature or otherwise discretionary, federal courts . . . can . . . decline to exercise jurisdiction altogether . . . By contrast, . . . federal courts may stay actions for damages based on abstention principles."  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 721 (1996); *see also Myles Lumber Co. v. CNA Fin. Corp.*, 233 F.3d 821, 823 (4th Cir. 2000) ("[A] district court may stay an action seeking damages but generally may not subject it to outright dismissal or remand [under abstention doctrines]."); *Lucas v. Henrico Cty. Pub. Sch. Bd.*, 767 F. App'x 444, 448 (4th Cir. 2019).  As such, while Counts I-II are potentially subject to outright dismissal, if abstention is warranted, Counts III-IV may only be stayed.

### A. *Younger* Abstention

*Younger* "espouse[s] a strong federal policy against federal-court interference" with certain categories of pending state judicial proceedings, absent extraordinary circumstances.  *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982).  "*Younger* abstention is mandated if the State's interests in the proceedings are so important that exercise of the federal

judicial power would disregard the comity extended between the States and the National Government." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 2 (1987); *see also Ackerman*, 734 F. at 248 (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)). The Supreme Court has identified three types of pending state proceedings that may present exceptional circumstances warranting *Younger* abstention: (1) "ongoing state criminal prosecutions," (2) "certain 'civil enforcement proceedings,'" and (3) "pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 591 (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367-68 (1989) ("*NOPSI*")) (internal quotation marks omitted). These three categories of cases define *Younger*'s scope. *Id.*

If a case falls within *Younger*'s scope, a federal court must abstain if there is "(1) an ongoing state judicial proceeding, instituted prior to any substantial progress in the federal proceeding; that (2) implicates important, substantial, or vital state interests; and (3) provides an adequate opportunity for the plaintiff to raise the federal constitutional claim advanced in the federal lawsuit." *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 165 (4th Cir. 2008) (citing *Middlesex County*, 457 U.S. 423, 432 (1982)); *see also Sprint*, 571 U.S. at 587, 593 (explaining that the three *Middlesex County* conditions are "not dispositive; they were, instead, *additional* factors appropriately considered by the federal court before invoking *Younger*.") (emphasis in original).

Defendants urge that *Younger* requires this Court to abstain from exercising jurisdiction over the pending case in favor of the State adjudicatory process, ECF 19, ECF 20. This Court, informed by its conclusion regarding the Tribe's lack of federal sovereign status, agrees.

i.    **Category of Proceedings**

The parties do not dispute that the State Case does not constitute a criminal or civil enforcement proceeding.  The threshold question then, is whether the State Case concerns a "pending 'civil proceeding[] involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions," such that *Younger* abstention may be appropriate.  *Sprint*, 571 U.S. at 586 (clarifying that *Younger* extends only to ongoing state criminal prosecutions, certain civil enforcement actions, and pending civil proceedings involving orders in furtherance of the state courts' ability to perform their judicial functions).  This Court concludes that it does.

On this point, the case of *Pennzoil* is instructive.  481 U.S. at 1.  In that case, Pennzoil initially filed a complaint in Texas state court, alleging that Texaco was liable for tortious inducement of breach of contract.  *Id.* at 4.  Pennzoil secured a jury verdict at trial, which was anticipated to exceed $11 billion.  Under Texas law, Texaco could suspend the execution of the judgment by filing a bond in the amount of judgment, interests, and costs, which, in Texaco's case, was expected to exceed $13 billion.  *Id.* at 5.  Before the state trial court entered final judgment, though, Texaco filed suit in federal district court, alleging that the Texas proceedings violated its federal constitutional and statutory rights and seeking an injunction against the State's enforcement of the judgment.  *Id*. at 6.  The federal district and appellate courts rejected Pennzoil's request for abstention under *Younger*, and the Supreme Court reversed.  In doing so, the Court emphasized that it "repeatedly has recognized that the States have important interests in administering certain aspects of their judicial systems," *id.* at 12, and drew heavily from its earlier decision in *Juidice v. Vail*, 430 U.S. 327, 335 (1977), which held that a state's contempt process was sufficiently important to warrant *Younger* abstention.  The Court rejected the contention that Texaco's federal

28

challenge to Texas's bond procedures did not implicate vital state interests because the procedures merely governed "the private interests of competing litigants." *Id.* at 13 (citing *Juidice*, 430 U.S. at 336 n.12). Rather, the Court determined that the state bond process, like the state's contempt process in *Juidice*, "stands in aid of the authority of the judicial system, so that its orders and judgments are not rendered nugatory." *Id.*; *see also id.* at 13-14 ("The reasoning of *Juidice* controls here. That case rests on the importance to the States of enforcing the orders and judgments of their courts. Both *Juidice* and this case involve challenges to the processes by which the State compels compliance with the judgments of its courts."). Accordingly, the Court concluded that *Younger* requires federal courts to abstain from challenges related to pending state proceedings where doing otherwise "would interfere with the execution of state judgments on grounds that challenge the very process by which those judgments were obtained." 481 U.S. at 14.

The reasoning in *Pennzoil* and *Juidice* applies with equal force to the instant case. Prior to this action, State Court Plaintiffs (all of whom are Interested Defendants here) initiated suit in the State Trial Court against Hinman seeking various remedies under Maryland corporate law. After a two-day trial, Hinman obtained an adverse judgment in which the State Trial Court ordered, among other remedies, that the Tribe shall hold an election prior to December 31, 2021. *See* ECF 31-5. To enforce its judgment, the State Trial Court retained jurisdiction to oversee the Tribe's election, and required that certain appointed members of the Tribe be granted access to tribal membership lists. ECF 31-5 at 9-10. Hinman appealed the case to the Maryland Court of Special Appeals. While Hinman's appeal was pending, Hinman—on behalf of the Tribe and the Tribal Corporation—filed this action, challenging the constitutionality of the State Trial Court's judgment and seeking a federal injunction to block its enforcement. *See* ECF 11 at 2 ("Plaintiffs further request that the Court issue an order mandating that Judge Campen refrain from taking any

action to enforce his Order of April 9, 2021 . . . and his order dated June 21, 2021"). As in *Pennzoil*, Plaintiffs ask this court to interfere with a state court's execution of its judgment "on grounds that challenge the very process by which those judgments were obtained." 481 U.S. at 14. The State Trial Court order—which enumerated several procedures to ensure the implementation of its judgment—is uniquely in furtherance of its ability to perform its core judicial functions of adjudicating civil disputes and enforcing its determinations accordingly. *Sprint*, 571 U.S. at 591. Simply put, this case, like *Pennzoil*, challenges "the processes by which the State compels compliance with the judgments of its courts." 481 U.S. at 13-14. This Court discerns no meaningful difference between the State's interest here in forcing persons to transfer corporate electoral authority in response to a court's judgment and the state's interest in *Pennzoil* "in forcing persons to transfer property in response to a court's judgment." *Id.* As such, this Court concludes that the State Case is a civil proceeding "involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions," which falls within *Younger*'s scope. *Sprint*, 571 U.S. at 591 (quoting *NOPSI*, 491 U.S. at 367-68).

**ii.  State and Federal Interests**

Having determined that the State Case falls within the category of proceedings to which *Younger* extends, this Court also concludes that the additional considerations enumerated in *Middlesex County* militate in favor of abstention.

"In *Middlesex County*, the Court listed three questions which must be answered in the affirmative for a case to merit abstention under *Younger*: 'first, do [the state proceedings] constitute an ongoing state judicial proceeding; second, do the proceedings implicate important state interests; and third, is there an adequate opportunity in the state proceedings to raise constitutional challenges.'" *Harper*, 396 F.3d at 352. Here, the parties do not dispute the first condition, and we

accordingly assume that the proceedings on appeal from the Somerset County, Maryland, Circuit Court constitute an ongoing state judicial proceeding instituted prior to any substantial progress in the instant case.  *See* ECF 18 at 6-7; ECF 19 at 1; ECF 20 at 2.  Similarly, Plaintiffs, in their supplemental briefing, did not argue that the State failed to provide adequate procedural avenues through which they could have raised relevant constitutional challenges.  ECF 18 at 6-7.  *See* *Pennzoil*, 481 U.S. 1, 14 ("the burden on this point rests on the federal plaintiff to show 'that state procedural law barred presentation of [its] claims.'" (quoting *Moore v. Sims*, 442 U.S. 415, 432 (1979))).  Indeed, any contention to the contrary is belied by the fact that the State Trial Court's opinion considered, and rejected, the constitutional claims raised here.  *See* ECF 31-5 at 5-6.  The applicability of *Younger*, will therefore turn fundamentally on *Middlesex County*'s second requirement—the presence of substantial state interests.

Important state interests militating in favor of abstention include those "that the Constitution and our traditions assign primarily to the states."  *Harper*, 396 F.3d at 352, 353.  Corporations, as creatures of state law, are among the areas over which states have always held primary sway.  Accordingly, "[c]orporate law . . . often reveals state interests important in *Younger* analysis."  *Id.* (citing *Worldwide Church of God, Inc. v. California*, 623 F.2d 613, 616 (9th Cir. 1980) (investigating fraud in charitable trusts)).

Here, the Tribe, through the Tribal Corporation, is incorporated as a Maryland, non-stock corporation.  *See* ECF 11-3.  As such, the Tribe enjoys all the powers prescribed by the Maryland Statute for Corporations, and is subject to the laws of the Maryland Corporate Code.  *See* ECF 31-5 at 5-6; ECF 19 at 2.  The State has a legitimate interest in administering its corporate law and resolving claims regarding its domestic entities, particularly those that involve allegations of fraud, *ultra vires* corporate conduct, and potential violations of the Maryland Corporate Code.  *See*

31

Complaint ¶¶ 14-18, State Trial Court.  Defendants also argue, and this Court agrees, that the State is further interested in ensuring the resolutions of disputes affecting the Tribe, which was granted formal "Maryland Indian Status" in December, 2017.  ECF 11-1 at 7.  In sum, Maryland's interests in the governance of its corporations and the well-being of its state-recognized tribes fits within the range of state interests that meet the standards for *Younger* abstention under *Middlesex County* and its progeny.

Plaintiffs urge that abstention would be improper given the State's continuing infringement upon the internal affairs of the Tribe, a sovereign state that enjoys common law immunity from suit.  ECF 18 at 7.  It is well established that *Younger* "respects the structural ramifications of the Constitution."  *Harper*, 396 F.3d at 348 n.3.  Indeed, *Younger* abstention is undergirded by the notion that the "Constitution[] []—through federalism—has reserved many functions to the states even as it has allocated others, for the benefit of all states, to the national government."  *Id.* at 354. Courts have accordingly concluded that *Younger* abstention is not appropriate in cases concerning a paramount federal interest, notwithstanding the fact that the state may have demonstrated a legitimate, countervailing interest.  *Id.* at 356 ("When there is an overwhelming federal interest— an interest that is as much a core attribute of the national government as the list of important state interests are attributes of state sovereignty in our constitutional tradition—no state interest, for abstention purposes, can be nearly as strong at the same time."); *see also Zahl v. Harper*, 282 F.3d 204, 210 (3d Cir. 2002) ("[T]he notion of comity, so central to the abstention doctrine, 'is not strained when a federal court cuts off state proceedings that entrench upon the federal domain.'" quoting *Ford Motor Co. v. Ins. Comm'r*, 874 F.2d 926, 934 (3d Cir. 1989))).

The Indian Commerce Clause and the regulation of Indian affairs are among the vital federal interests that may preclude *Younger* abstention.  *See Harper*, 396 F.3d at 357 n.3 ("Our

sister circuits have recognized . . . that the Indian Commerce Clause . . . creates a similarly weighty national interest in regulating Indian affairs.") (collecting cases).  Conversely, any legitimate state interest in a pending proceeding is extinguished by the involvement of a non-consenting sovereign tribal entity, over which the state courts lack jurisdiction.  *See Puyallup Tribe, Inc. v. Dep't of Game of State of Wash.*, 433 U.S. 165, 172 (1977).  Neither the states, nor their courts, have a legitimate interest in exceeding their lawful authority.  *See Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 541 (9th Cir.1995) ("*Younger* abstention is not appropriate in a case in which a 'state tribunal is acting beyond its authority.'") (internal quotations omitted); *see also Seneca-Cayuga Tribe v. State. ex rel. Thompson*, 874 F.2d 709, 714 (10th Cir. 1989) ("The relative insignificance of [the state's] interest in this case is further demonstrated by the lack of jurisdiction in the state court to hear the suit against the Tribes.").  In sum, infringement upon the sovereignty of a tribal entity may enhance the federal interests and negate any countervailing state interests such that abstention under *Younger* is plainly unwarranted.  *See id.* at 716 ("The federal nature of the law and of the issues to be decided, combined with this lack of state jurisdiction, reduce the State's interest in this litigation to the vanishing point.").

Above, however, this Court determined that the Tribe did not meet its burden of showing its status as a federal common law tribe entitled to sovereign immunity.  Nor is the Tribe otherwise federally recognized.  The State Case does not, therefore, implicate weighty national interests such as the regulation of Indian affairs or the safeguarding of Indian tribal sovereignty, which may otherwise counsel against abstention.  Rather, the State Case turns on the application of Maryland law to a domestic entity.  Put differently, this Court discerns no countervailing federal interest sufficient to interfere with the enforcement of an order issued by a state court of competent jurisdiction in furtherance of its core judicial functions in an ongoing proceeding.  In sum, this

Court is required to abstain under *Younger* and its progeny.  Nevertheless, in the interest of thoroughness, the Court will continue to analyze other potentially applicable abstention doctrines.

### B. *Colorado River* **Abstention**

"[U]nder the *Colorado River* doctrine, a federal court may abstain from exercising jurisdiction over a duplicative federal action for purposes of 'wise judicial administration.'" *VonRosenberg v. Lawrence*, 849 F.3d 163, 167 (4th Cir. 2017) (citing *Colorado River*, 424 U.S. at 818).  The *Colorado River* doctrine must be applied parsimoniously.  *Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 463 (4th Cir. 2005).  The task is not "to find some substantial reason for the *exercise* of federal jurisdiction by the district court" but rather to ascertain whether "exceptional circumstances" justify the surrender of jurisdiction.  *VonRosenberg*, 849 F.3d at 168 (emphasis in original) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25-26 (1983)).

In deciding whether abstention under *Colorado River* is appropriate, a court "must first determine whether the federal and state actions are parallel."  *Id.*  If the federal and state suits are duplicative, courts must conduct a careful, holistic analysis of several relevant considerations, "with the balance heavily weighted in favor of the exercise of jurisdiction."  *Id.* (quoting *Moses H. Cone*, 460 U.S. at 16)).  After consideration of the parties, claims, and issues in both the state and federal fora, this Court concludes that the federal action is duplicative, and that the balance of pertinent considerations weighs in favor of abstention.

i.   **Parallel Proceedings**

"The threshold question in deciding whether *Colorado River* abstention is appropriate is whether there are parallel federal and state suits." *Chase Brexton*, 411 U.S. at 463. The requirement of parallel, or duplicative, actions is strictly construed. *Id.* at 465. State and federal suits are parallel only "if substantially the same parties litigate substantially the same issues in different forums." *New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 946 F.2d 1072, 1073 (4th Cir. 1991). To be parallel actions, "[i]t is not enough for parties in the state and federal actions to be merely aligned in interest." *VonRosenberg*, 849 F.3d at 168 (federal action between rival Bishops is not sufficiently similar to a state action between their respective churches in which neither individual Bishop is a named party). "Rather, the parties involved [must] be almost identical." *Chase Brexton*, 411 F.3d at 464 (concluding that parties are insufficiently similar where five of seven federal plaintiffs were not involved in the pending state proceeding). Similarly, state and federal actions are not parallel merely because the claims arise from the same factual circumstances. *VonRosenberg*, 849 F.3d at 168-69 (insufficiently similar claims where state court did not consider Lanham Act claims raised in federal court). A federal action is only duplicative if the "state-court litigation will be an adequate vehicle for the *complete* and prompt resolution of the issues between the parties." *Id.* (quoting *Moses H. Cone*, 460 U.S. at 28) (emphasis in original). Here, both the parties and the issues in this Court are sufficiently identical to be considered duplicative to the pending state action.

The case pending before this Court involves parties that are almost identical, rather than merely aligned, with the pending State Court action. The State Case was initiated by State Court Plaintiffs on behalf of the Tribal Corporation against Hinman. The pending action in this Court was filed by Hinman, on behalf of the Tribe and the Tribal Corporation, against the State Court

Plaintiffs and seven additional named Defendants. The additional Defendants include six individuals associated with the Wolf Clan—Tapman, Laughman, Vivian Tyler, Ennis, Julie Gilroy, and Kenny Gilroy—and Judge Campen, who presided in the State Trial Court. For several reasons, the presence of additional Defendants does not defeat the parallelism of the two actions on these facts. First, *Colorado River* does not demand that the parties be precisely identical. *See* 424 U.S. at 805-06 (parties lacking exact identicality); *see also Sto Corp. v. Lancaster Homes*, Inc, 11 F. App'x 182, 187 (4th Cir. 2001) ("the parties only need to be substantially the same for the Colorado River abstention doctrine to apply."). Second, the Plaintiffs in this federal action are all named parties in the State Case.[13] Accordingly, to abstain in favor of the state proceeding would not deprive any federal litigant of an opportunity to litigate their claims. *Compare Chase Brexton*, 411 F.3d at 464 (no duplicity where abstention would deprive five of seven plaintiff healthcare providers of an opportunity to litigate their claims). Third, and perhaps most fundamentally, the additional named Defendants do not merely have interests that are aligned with the State Court Plaintiffs; rather, they collectively comprise a single interest—that of the new, disputed tribal leadership.[14] All additional Interested Defendants are named only for their affiliation in, or with,

---

[13] This Court notes that the Tribe—as distinct from the Tribal Corporation—is a named Plaintiff in this action, but is not a formal party to the State Case. This fact is immaterial, however, in light of Plaintiffs' repeated insistence that the Tribe and the Tribal Corporation are functionally indistinguishable. *See* ECF 11-1 ("Here, the government of the Accohannock Tribe and the government of the Accohannock Indian Tribe, Inc. have been one and the same ever since the corporation was formed . . . The Tribe and the Tribal Corporation are not maintained separately."); ECF 1 ¶ 16 ("[T]he Tribe has made no differentiation between the activities of the Tribe and those of the Accohannock Indian Tribe, Inc."). The Court accordingly treats the Tribe and the Tribal Corporation as a singular Plaintiff for purposes of its party analysis.

[14] Plaintiffs protest that "the incumbent government of the Accohannock Indian Tribe was never made a party" to the State Case. ECF 11-1 at 6-7. These individuals were similarly not named by Hinman as parties to this action, nor did they join as plaintiffs. Accordingly, these unnamed parties would have no greater opportunity to litigate in this Court than in State Court.

the Wolf Clan and their presence on the disputed tribal council.  *See* ECF 1 ¶¶ 25, 33.  Put differently, Plaintiffs' Complaint alleges no distinct injury perpetrated by the additional Defendants, which would otherwise not be vindicated in the State Case.  *Id*.  The similarity of the parties is not defeated merely because Hinman, on behalf of Plaintiffs, named several additional members of the same faction against whom he is litigating in the State Case.[15]

The federal and state actions here also satisfy the requirement of duplicative claims because the disposition of the State Case will completely resolve all claims in the pending federal proceedings.  In the State Case, State Court Plaintiffs sought equitable relief and possible damages for Hinman's allegedly unlawful disposition of Tribe property, and his refusal to accede to duly elected tribal leadership.  *See* Complaint ¶¶ 14-18, State Trial Court.  For his part, Hinman in the State Case asserted tribal sovereign immunity, and alleged the Wolf Clan's unlawful usurpation of authority over the Tribe and resultant seizure of tribal property and assets.  *See* Answer, State Trial Court; Motion for Protective Order, State Trial Court.  These exact factual circumstances form the basis of Plaintiffs' pending federal action, which similarly seeks equitable and monetary remedies. Moreover, the resolution of these claims in the State Case will necessarily dispose of Plaintiffs' pending claims in this Court regarding the sovereign immunity of the Tribe, Tribal Corporation, and Hinman.  *See* ECF 1 at Counts I-II, Count IV.   It will also conclusively resolve Plaintiffs' RICO claim, where the alleged pattern of racketeering activity is entirely premised on Interested Defendants' allegedly fraudulent representations as officers of the Tribe and allegedly unauthorized trespass on tribal premises.  *See* ECF 1 ¶¶ 26-27.  *Compare VonRosenberg*, 849 F.3d

---

[15] Similarly, the inclusion of Judge Campen as a named Defendant does not defeat parallelism where Plaintiffs themselves do not consider him a "real party in interest."  ECF 1 at 1.  Plaintiffs further note that Judge Campen "is named only in his official capacity" and acknowledge that he enjoys judicial immunity, *id.* ¶ 50.

at 169 (federal court plaintiff alleged individual Lanham Act false advertising claim, causing distinct harms from those complained of in state court).  Essentially, Plaintiffs and Interested Defendants each claim to be the legitimate leaders of the Tribe.  Their respective positions are fundamentally incompatible and resolution in one forum in favor of one side disposes of the opposing claims by the other side, regardless of the precise legal theory.

ii.   **Additional Factors**

If the federal and state suits are duplicative, courts must carefully balance several additional factors before abstaining.  These factors include:

> (1) whether the subject matter of the litigation involves property where the first court may assume in rem jurisdiction to the exclusion of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state law or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights.

*VonRosenberg*, 849 F.3d at 168 (citing *Chase Brexton*, 411 F.3d at 463-64).  Courts must undertake this analysis holistically, as no single factor is necessarily determinative.  *Moses H. Cone*, 460 U.S. at 16.  Moreover, although "[t]he weight to be given to any one factor may vary greatly from case to case," the balance must always be "heavily weighted in favor of the exercise of jurisdiction."  *Id.*

In the instant case, four relevant considerations favor abstention.  First, the federal forum is inconvenient.  The Tribal Corporation is located in Crisfield Maryland, roughly 19 miles from State Trial Court and 124 miles from the Maryland Court of Special Appeals.  By contrast, this Court sits in Baltimore Maryland, over 150 miles from the Tribal Corporation's headquarters.[16]

---

[16] This Court may take judicial notice of Google Maps and online distance calculations as a source whose accuracy cannot reasonably be questioned.  *See United States v. Ruffin*, 814 F. App'x 741,

Second, and perhaps most persuasively, the order in which the lawsuits were filed strongly favors abstention. This factor looks "not only to which action was filed first but also to 'how much progress has been made in the two actions.'" *Sto Corp.*, 11 F. App'x at 188 (quoting *Moses H. Cone*, 460 U.S. at 21). The State Trial Court obtained jurisdiction over the State Case in May, 2020, roughly one year and five months before Plaintiffs filed their complaint in this Court in October, 2021. The State Case has substantially progressed during this intervening period. The State Trial Court proceeded through pleadings, conducted and completed discovery, presided over a two-day jury trial, and issued its judgment accordingly. Hinman timely appealed to the Maryland Court of Special Appeals, where the State Case remains pending. By contrast, this Court has yet to reach the merits of the case. *See id*. at 189 ("This long, active history in state court stands in stark contrast to the brief history in federal court . . . [where] the activity there was essentially limited to consideration of whether that action should be dismissed or stayed."). Third, Maryland state law provides the rules of decisions on the merits. As described above, this action does not implicate sovereign tribal immunity. Instead, resolution of Plaintiffs' claims would require this Court to delve into complicated issues of the Maryland Corporate Code, and the parties' respective rights and obligations therein. *See, e.g.*, ECF 1 ¶¶ 45. Although Plaintiffs' complaint states a federal RICO claim, the alleged predicate acts of racketeering activity are contingent on resolution of Interested Defendants' status as officers of the Tribal Corporation—an inquiry which is governed by state law, and which the State Trial Court has already conducted. *Id.* ¶¶ 27-28 (alleging wire fraud and mail fraud based on Interested Defendants' false representations as officers of the Tribe and unauthorized entry onto tribal property). Fourth, there is no evidence to

---

755 n.2 (4th Cir. 2020) (unpublished); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 711 n.5 (4th Cir. 2018).

suggest that Maryland state courts are somehow incapable of adjudicating the parties' respective rights under the state's own corporate laws.  Plaintiffs contest this point, asserting that "the state-court proceedings are completely inadequate to protect the rights of the parties.  By definition, the state court in this matter has not only injected itself into Tribal government, but it has, on its own initiative, entered orders that violate the sovereign rights of the Tribe . . .".  ECF 18 at 8-9.  Having concluded, however, that the State Case does not implicate sovereign interests, this Court finds no reason to doubt Plaintiffs' ability to pursue their rights in the state court system.

The remaining two factors are not present here.  The case does not involve real property over which the State Court has asserted in rem jurisdiction, ECF 18 at 8, nor is there an especially strong possibility of piecemeal litigation.  *See Sto Corp.*, 11 F. App'x at 187-88.  ("The threat of inconsistent results and judicial inefficiency, without more, does not satisfy this factor.").  Even so, "a decision to abstain does not require the presence of all of the factors," but rather, that the analysis is conducted "in a pragmatic, flexible manner with a view to the realities of the case at hand."  *Id.* at 187 (quoting *Moses H. Cone*, 460 U.S. at 2).  Indeed, as the Fourth Circuit has recognized, there are circumstances in which "a factor-by-factor analysis does not fully convey the synergistic effect of all the circumstances."  *Vulcan Chem. Techs., Inc. v. Barker*, 297 F.3d 332, 343 (4th Cir. 2002) (federal district court should have abstained where state court confirmed arbitration award in a judgment pending appeal).  A similarly synergistic effect is present in this action.  In the State Case, Hinman initially signaled his acknowledgment that the dispute— although involving a state-recognized tribe—was properly adjudicated in the state tribunal.  *See* Motion for Protective Order, State Trial Court at 12 ("The Accohannock Tribe is not a federally recognized tribe and, therefore, cannot assert immunity; nevertheless, its recognition by the State at a minimum sets the Tribe apart from mere civic and benevolent organizations.  Accordingly,

interference in the affairs of a Maryland-recognized tribe should be approached with caution."). Now, having lost in the State Trial Court, Hinman, on behalf of the Tribe and Tribal Corporation, brings duplicative issues before this Court.   The Fourth Circuit, however, has previously condemned similar efforts, concluding that:

> To validate this strategy would undermine several traditionally valued tenets of wise judicial administration.  The judicial system promises one trial, and, by enforcing doctrines of res judicata, collateral estoppel, and full faith and credit, seeks to prohibit relitigating the same issues when the first trial was fair.  Moreover, in our dual system of government, again through full faith and credit, the *Rooker–Feldman* doctrine, the *Erie* doctrine, abstention, and other similar doctrines, respect is given by both state and federal governments to the courts of the other.  At bottom, the federal-state system of courts seeks, in a cooperative effort, to give one fair trial on a given dispute, to respect each other, and thus to administer justice efficiently.

*Vulcan Chem.*, 297 F.3d at 343.  In sum, this Court concludes that the principles of comity and federalism underlying *Younger* abstention, and the precepts of wise judicial administration furthered by *Colorado River*, both counsel in favor of federal abstention.  Counts I-II, seeking equitable and injunctive relief, shall be dismissed; Counts III-IV will be stayed pending conclusion of the State Case.

## IV.   *ROOKER-FELDMAN* DOCTRINE

This Court further concludes that even assuming, *arguendo*, that abstention were improper, the *Rooker-Feldman* doctrine precludes this Court from reaching the merits of Counts I-II of Plaintiffs' Complaint.

The *Rooker-Feldman* doctrine bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting [federal] court review and rejection of those judgments."  *Thana v. Bd. of License Comm'rs for Charles Cty., Md.*, 827 F.3d 314, 319 (4th Cir. 2016) (internal quotation marks omitted) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).

"[J]urisdiction to review such decisions lies exclusively with superior state courts and, ultimately, the United States Supreme Court." *Plyler v. Moore*, 129 F.3d 728, 731 (4th Cir. 1997). This Court has an independent obligation to examine whether *Rooker-Feldman* precludes its adjudication of a pending claim. *See Hertz Corp. v. Friend*, 559 U.S. 77 (2010) (Federal courts have "an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it."); *see also Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) ("[Q]uestions of subject-matter jurisdiction may be raised at any point during the proceedings and may (or, more precisely, must) be raised *sua sponte* by the court.").

The Supreme Court has long recognized that the jurisdiction of district courts is "strictly original," such that they may not entertain petitions for relief from allegedly unconstitutional state judgments. *Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 415-16 (1923) (federal district court properly concluded that it could not entertain parties' petition to declare state court judgment "null and void."). In analyzing a complaint, district courts must endeavor to separate and preserve claims that survive judicial inspection from those that fail the jurisdictional threshold. *Exxon Mobil Corp.*, 544 U.S. at 286. Courts may properly analyze challenges to state rules, laws, and regulations, but only insofar as the analysis "do[es] not necessarily require a United States District Court to review a final state court judgment in a judicial proceeding." *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 486 (1983); *see also id.* (federal district courts "do not have jurisdiction, however, over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional."). The Supreme Court has emphasized the narrow scope of *Rooker-Feldman. See Exxon Mobil Corp.*, 544 U.S. at 292. Federal district courts do not lack jurisdiction merely because "a party attempts to litigate in federal court a matter previously litigated in state court." *Id.* at 293. Rather, *Rooker-Feldman* is confined

to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments."  *Id.* at 281; *see also Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994); *Adkins v. Rumsfeld*, 464 F.3d 456, 464 (4th Cir. 2006).  As such, the *Rooker-Feldman* doctrine applies only when: "(1) the federal court plaintiff lost in state court; (2) the plaintiff complains of 'injuries caused by state-court judgments;' (3) the state court judgment became final before the proceedings in federal court commenced; and (4) the federal plaintiff 'invit[es] district court review and rejection of those judgments.'"  *Willner v. Frey*, 243 F. App'x 744, 746 (4th Cir. 2007) (quoting *Exxon Mobil Corp.*, 544 U.S. at 284).

In the instant case, Counts I-II satisfy *Rooker-Feldman*'s requisite conditions.  First, the Complaint was filed by Hinman on behalf of the Tribe and the Tribal Corporation following Hinman's adverse judgment in the State Trial Court.  Second, Plaintiffs allege that the state court itself is the source of their injuries in Counts I-II.  In both counts, Plaintiffs' complained injury is produced by the State Trial Court's intervention in tribal affairs.  *See* ECF 1 ¶ 45 ("The Court's retention of ongoing jurisdiction, and the ongoing activities of the Defendants under color of this order, *are causing* the Tribe to sustain ongoing irreparable harm . . . ") (emphasis added).  In contrast, Counts III-IV allege injuries arising from racketeering activity and constitutional violations, which were allegedly perpetrated by Interested Defendants, and merely left unpunished by the State Trial Court.  *See Hulsey v. Cisa*, 947 F.3d 246, 250 (4th Cir. 2020) ("a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." (quoting *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 88 (2nd Cir. 2005))).  Third, Plaintiffs claims in Counts I-II specifically

"'invit[e] district court review and rejection' of a state-court judgment, as would typify an appeal." *Id.* at 25 (quoting *Exxon*, 544 U.S. at 284). Count I does so in language that echoes *Rooker* itself. *Compare* ECF 1 ¶ 43 ("Plaintiffs seek a declaration that . . . the Order entered by Judge Campen is null and void as to both the Tribe and the Tribal corporation . . ."), *with Rooker*, 263 U.S. at 414 (Plaintiff seeks "to have a judgment of a circuit court in Indiana, which was affirmed by the Supreme Court of the state, declared null and void . . ."). Similarly, Count II requests that this Court functionally reverse the State Trial Court's judgment, albeit in less explicit terms. ECF 1 ¶ 45 (requesting "an Order . . . providing . . . [t]hat Judge Campen refrain from taking any action to enforce his Order of April 9, 2021 'concluding that the Wolf Clan are members of the Tribe' and his Order dated June 21, 2021"). Rather than present independent claims, both Counts I-II specifically, and improperly, seek this Court's review, and injunction, of the State Trial Court.

As to the final element, the question of whether "the state court judgment became final before the proceedings in federal court commenced" is somewhat less straightforward. *Willner*, 243 F. App'x at 746. There is no doubt that the action in this Court was filed in October, 2021, months after the entry of the relevant state-court judgments were issued in April and June, 2021, respectively. There remains some disagreement, however, as to whether orders such as these— which are pending appeal from a state trial court—are sufficiently final as to fall within *Rooker-Feldman*, with the majority of circuits concluding that they are not. *Compare Malhan v. Sec'y United States Dep't of State*, 938 F.3d 453, 459 (3d Cir. 2019) (collecting cases and joining a majority of circuits in concluding that *Rooker-Feldman* applies only where the state court of last resort has affirmed judgment, the state action has reached a point where neither party seeks further action, or state court of last resort has resolved relevant federal issues) *with RLR Invs., LLC v. City of Pigeon Forge, Tennessee*, 4 F.4th 380 (6th Cir. 2021) (holding that *Rooker-Feldman* may apply

to interlocutory orders from lower state courts).  The Fourth Circuit, for its part, has not specifically reached the issue.  *See Horowitz v. Cont'l Cas. Co.*, 681 F. App'x 198 (4th Cir. 2017) (affirming without discussion the district court's dismissal on *Rooker-Feldman* of state trial court judgment pending appeal to the Maryland Court of Special Appeals) *contra Thana*, 827 F.3d 314, 321 (4th Cir. 2016) (musing that "if we apply strictly the Supreme Court's instruction . . . we would conclude that the doctrine does not apply here because the district court here was not called upon to exercise appellate jurisdiction over a final judgment from '*the highest court of a State in which a decision could be had*,'") (emphasis in original) (internal citations omitted).  Even so, district courts in this circuit have previously determined that *Rooker-Feldman* extends to orders from state trial courts.  *See Field Auto City, Inc. v. Gen. Motors Corp.*, 476 F. Supp. 2d 545, 553 (E.D. Va.), aff'd, 254 F. App'x 167 (4th Cir. 2007) ("the purpose of *Rooker-Feldman*, namely to prevent de facto appeals from state courts to lower federal courts, is best served by applying the doctrine to state trial court judgments as well as state appellate court judgments").

This Court, finding the reasoning in *Field* and *RLR Invs*. persuasive, concludes that *Rooker-Feldman* would operate to bar Counts I and II of Plaintiffs' claims, even if abstention under *Younger* and *Colorado River* did not separately warrant dismissal.

## V.   CONCLUSION

For the reasons set forth above, Plaintiffs' Complaint, ECF 1, will be DISMISSED as to Counts I-II.  Further proceedings as to Counts III-IV shall be STAYED pending the resolution of the State Case.  A separate Order follows.


Dated:  December 14, 2021                              _____/s/_____
                                                       Stephanie A. Gallagher
                                                       United States District Judge